IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SONYA DUNCAN, | ) | Case No. 1:24-cv-01342 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

**I.      Introduction**

Plaintiff, Sonya Duncan ("Duncan"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Duncan raises one issue on review of the Administrative Law Judge's ("ALJ") decision, arguing that the ALJ's finding that Duncan was capable of a significant number of jobs was unsupported by substantial evidence as the ALJ's residual functional capacity finding does not include Duncan's documented need to elevate her legs throughout the workday. This matter is before me pursuant to 42 U.S.C. 405(g), 1383(c)(3) and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Duncan's applications for DIB and SSI be affirmed.

**II.     Procedural History**

On July 21, 2023, Duncan filed applications for DIB and SSI alleging her disability began January 1, 2021. (Tr. 171-84). The claims were denied initially and on reconsideration.

1

(Tr. 73, 80, 92, 101). On December 13, 2023, she requested a hearing before an ALJ. (Tr. 123). Duncan, with representation, and a vocational expert ("VE") testified before the ALJ on April 3, 2024. (Tr. 43-65). At the hearing, the ALJ granted Duncan's oral motion to amend her alleged onset date to December 31, 2022. (Tr. 46).

On April 11, 2024, the ALJ issued a written decision finding Duncan not disabled. (Tr. 21-42). The Appeals Council denied her request for review on June 6, 2024, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 8-13). Duncan timely instituted this action on August 5, 2024. (ECF Doc. 1).

**III.    Evidence**

    **A.    Personal, Educational and Vocational Evidence.**

Duncan was 41 years old on the date her application was filed. (Tr. 151). She dropped out of school after completing the tenth grade. (Tr. 563). She has past relevant work as a home attendant, DOT #354.377-014, with an SVP of 3 and an exertional level of medium, although she performed it at the very heavy level; industrial cleaner, DOT #381.687-018, with an SVP of 2 and a medium exertional level; and punch press operator, DOT #615.685-030, with an SVP of 3 and a medium exertional level. (Tr. 62).

    **B.    Relevant Medical Evidence**

Records submitted from the Cleveland Clinic indicate that on December 26, 2022, Duncan presented to the emergency department reporting extreme fatigue and weakness and noting that she will "drift off" mid-conversation and slur her words. (Tr. 309). She further indicated that she has yellowing skin and confusion. (*Id.*). Duncan admitted she had been abusing heroin, fentanyl, gabapentin, and cocaine. (Tr. 311). The treating physician assistant did

2

not appreciate skin yellowing and noted that Duncan suggested her lower extremity edema had improved from her baseline. (Tr. 314).

On January 4, 2023, Duncan attended an appointment with her physician, Erick Kauffman, M.D., complaining of leg swelling. (Tr. 459). Duncan stated she has had increasing foot swelling and pain. (*Id.*). She reported that she works at a factory on her feet and after working she will have to elevate her feet and apply ice packs throughout the night. (*Id.*). She has also been using Lasix but has still been missing work more often. (*Id.*). Duncan claimed that she was no longer using opioids and noted a history of cirrhosis relating to hepatitis C. (*Id.*). Dr. Kauffman assessed her with salivary duct calculi, lower leg edema, and chronic hepatitis C without hepatic coma, and indicated "severe lymphedema is preventing her from working." (Tr. 460-61).

On June 9, 2023, Duncan presented to the emergency department with a chief complaint of "bruising on my legs." (Tr. 303). She reported injuring her leg several days earlier and had since developed bright red spots on her right lower extremity and a "large purple area on the calf." (Tr. 303-04). Duncan stated that she was no longer injecting street drugs, but she had last snorted "medications" a couple of weeks ago. (Tr. 304). Examination revealed no tense palpation of the extremities, a large purpuric area on the right calf and areas of petechiae in the right lower extremity. (Tr. 305). Her gait was normal and there was "low suspicion for cellulitis." (Tr. 305-06). Duncan left against medical advice before the treating physician assistant had completed his assessment, but his clinical impressions included acute purpuric eruption, class 2 obesity without serious comorbidity with BMI of 35.0-39.9, chronic hepatitis C with cirrhosis and personal history of drug abuse. (Tr. 308).

3

On July 10, 2023, Duncan appeared at the emergency department with swelling and sores all over her left leg from the knee down. (Tr. 502). Her condition had begun a few weeks earlier, and she had been treating with ice and Lasix, but she had recently developed blood blisters that were draining blood and yellow fluid. (*Id.*). Multiple lesions had appeared on her lower leg, and she had recently woken up with a purplish discoloration of her lateral left foot and ankle. (*Id.*). Her leg felt hot and did not improve, so she came to the emergency department. (*Id.*). She reported a history of compartment syndrome of the right leg five years ago, and chronic staph infections. (*Id.*). A CT scan of her left lower extremity showed diffuse left leg soft tissue swelling extending to the superficial investing fascia circumferentially, likely representing edema and/or cellulitis. (Tr. 501). She also underwent a Lower Extremity Venous Duplex Report which showed no evidence of acute deep vein thrombosis or superficial vein thrombosis of the bilateral lower extremities. (Tr. 554). It did show enlarged lymph nodes in bilateral groins. (*Id.*). She was admitted to the hospital, and on discharge on July 12, 2023, she was diagnosed with left lower extremity cellulitis, wound infection, and history of intravenous drug abuse. (Tr. 521).

A note from the Neighborhood Family Practice from October 4, 2023, indicated Duncan had relapsed with heroin. (Tr. 481). She had been injecting but was now snorting as a means of weaning herself off of heroin. (*Id.*).

    **C.**     **Medical Opinion Evidence**

        **i.**     **State Agency Reviewers**

On July 27, 2023, state agency reviewing physician Gary Hinzman, M.D., determined that Duncan was capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently, consistent with a light exertional level. (Tr. 71). She was limited to six hours of sitting during an eight-hour workday but could only stand/walk for 2 hours. (*Id.*). She could occasionally climb

4

ramps or stairs but could never climb ladders, ropes, or scaffolds. (*Id.*). She could frequently balance and occasionally stoop, kneel, crouch or crawl. (*Id.*). She needed to avoid all exposure to commercial driving or unprotected heights. (Tr. 72). On September 26, 2023, state agency reviewing physician Sreenivas Venkatachala, M.D., confirmed Dr. Hinzman's opinion. (Tr. 88-89).

On November 28, 2023, state agency reviewing psychologist Kevin Lauer, Ph.D., opined that Duncan had moderate limitation in interacting with others and adaptation but only mild limitations understanding, remembering, and applying information and concentrating, persistence and maintaining pace. (Tr. 86). Dr. Lauer further found that Duncan had moderate limitations in her ability to interact appropriately with the general public and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 90). She was also moderately limited in her ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. (*Id.*).

    ii.    **Consultative Examination Reports**

On October 25, 2023, Duncan attended a consultative examination with Tom Ferrence, Ph.D., MPH. (Tr. 562-67). Duncan reported that she considered herself widowed, although she had never married her partner of 20 years, and she had two children. (Tr. 563). She had a tenth grade education and had been enrolled in special education services throughout her schooling due to learning problems. (*Id.*). She completed specialized vocational training to become a State Tested Nursing Assistant. (*Id.*). She endorsed a history of problems with opiate pills but denied current symptoms indicative of a substance use disorder. (*Id.*). She noted problems with severe lymphedema in both legs, cellulitis of the left lower extremity, wound infection, ulcers, pressure sores on her legs, asthma, and hepatitis C. (*Id.*). She had no history of mental health treatment.

5

(Tr. 564). She reported depressive symptoms including fatigue/loss of energy, periods of hypersomnia, low motivation, loss of pleasure in activities, poor concentration, poor quality mood, and social withdrawal. (*Id.*). She also endorsed anxiety symptoms including heart palpitations/rapid heartbeat, chest tightness, poor concentration, sweating, and shaking. (*Id.*).

Duncan further reported that she was homeless and was unable to complete household chores due to problems with physical functioning. (*Id.*). She had difficulty shopping for groceries and preparing meals due to anxiety and physical health issues. (*Id.*). She was able to pay bills and manage medication, and her home activities included listening to music and using the internet. (*Id.*). She had occasional contact with family and maintained generally positive relationships. (*Id.*). Dr. Ferrence noted that Duncan seemed physically uncomfortable throughout the exam and made only intermittent eye contact. (Tr. 565). Her intellectual functioning appeared to be within normal limits. (*Id.*).

Based on the examination, Dr. Ferrence diagnosed Duncan with Major Depressive Disorder, recurrent, mild, and Unspecified Anxiety Disorder. (Tr. 566). He did not find any suggestion Duncan would have difficulty understanding, remembering, or carrying out instructions. (Tr. 566-67). He noted that Duncan self-reported a history of problems with concentration, persistence, and pace in work settings, but found no evidence of difficulty with these functions during the examination. (Tr. 567). He noted that Duncan presented as depressed which could impact her interpersonal interactions in a work setting, including limited or negative social interactions. (*Id.*). Dr. Ferrence noted that Duncan appeared emotionally overwhelmed which could impact her mood stability in a competitive work setting. (*Id.*). He also noted she reported problems managing pressure in prior work settings which contributed to avoidance and missed work. (*Id.*).

6

### iii. Treating Source Opinions

Duncan's physician, Dr. Kauffman, offered two opinions concerning her condition. The first, submitted in a letter dated January 4, 2023, noted that Duncan suffered from "severe lymphedema in both legs" and opined that she would be unable to work due to that condition. (Tr. 295). The second opinion, dated March 26, 2024, took the form of a medical source statement. (Tr. 575-77). Here, Dr. Kauffman diagnosed Duncan with chronic severe lymphedema, recurrent cellulitis in her legs, and chronic leg pain, and noted symptoms including massive leg edema bilaterally, sores on her ankles, pressure and pain in her legs, and fatigue. (Tr. 575). He opined that Duncan will have good and bad days; that she will be absent from work more than 4 times monthly; that she can walk less than one city block; that she can sit 45 minutes continuously and at least six hours of an eight hour workday; that she can stand 30 minutes continuously and less than two hours of an eight hour workday; that she needs to be able to shift positions at will while working; that she would require unscheduled 30 minute breaks every one to two hours while working in order to elevate her legs; that she can frequently lift less than 10 pounds, occasionally lift 10 pounds and rarely lift 20 pounds; that she can rarely twist, stoop, or climb stairs and never crouch or climb ladders; that she can handle, finger, or reach 20% of the time bilaterally; and that will be off task more than 25% of the time while working. (Tr. 575-77). He noted that her conditions started in February 2022 and were "rapidly progressive." (Tr. 577).

### D. Administrative Hearing Evidence

On April 3, 2024, Duncan testified before the ALJ that she previously worked as a home health aide (Tr. 48-50), as a cleaner for a roofing and home renovation company (Tr. 50-54), and as a machine operator for a plating company. (Tr. 54-57). She further testified she was no longer able to work because her legs do not allow her to move around freely and she has to "constantly

7

have them elevated above the heart or they swell." (Tr. 57). She added that once they swell, it turns into cellulitis, and they get infected. (*Id.*). Her hands have also started swelling, making it difficult to grip, hold, or open anything. (Tr. 57-58). Her legs will start swelling within in an hour if she is standing, and she has to sit down for 20 to 30 minutes with her legs propped up to reduce the swelling. (Tr. 58). She has a lymphatic pump that she uses for an hour in the morning and an hour in the evening that helps reduce the swelling, and she sometimes uses it during the day. (*Id.*). She takes water pills as well, and as a result, she has to use the restroom every two hours throughout the day and night. (Tr. 59). If she sits at a desk with her legs "hanging" her legs will also swell due to gravity. (*Id.*). She has experienced infections, noting that she has been on antibiotics eight to ten times in the last year, and has had to go to the hospital for I.V. antibiotics. (*Id.*).

Duncan further testified that she has a history of opioid abuse, but other than a relapse the prior year she has been clean for a year and a half. (Tr. 60). She has pain in her legs that feels like "Charley Horses in her calves." (*Id.*). She testified that she loses her balance standing when her legs are swollen. (*Id.*). She had been missing work often because after a workday her legs would swell so much, she would take two to three days off to sit or lay with her legs elevated. (Tr. 61). She reported some difficulty due to her mental health, but she has not received any mental health treatment and feels she "can manage mentally at work." (*Id.*). Duncan added that the swelling in her hands had started a couple of months ago, but it is not as bad as her legs. (*Id.*). She has started to try to keep her hands elevated as well. (Tr. 62).

Following Duncan's testimony VE Jennifer Stone testified. She labeled Duncan's past work as a home attendant, DOT #354.377-014, with an SVP of three, generally performed at the medium exertional level and actually performed at very heavy; as an industrial cleaner, DOT

8

#381.687-018, with an SVP of two, and generally and actually performed at medium; and as a punch press operator, DOT #615.685-030, with an SVP of two, and generally and actually performed at medium. (*Id.*).

For her only hypothetical, the ALJ asked the VE to consider an individual capable of lifting and carrying 10 pounds frequently and 20 pounds occasionally; of standing or walking only two hours per day; of pushing/pulling occasionally with the bilateral lower extremities; of occasionally climbing ramps or stairs but never climbing ladders, ropes or scaffolds; of frequently balancing but only occasionally stooping, kneeling, crouching, or crawling; but who must avoid all hazards, defined as work at unprotected heights or commercial driving. (Tr. 63). The VE opined that this individual would be incapable of performing Duncan's past work, but could work as a storage facility rental clerk, DOT #295.367-026, with an SVP of two and a light exertional level and 58,300 jobs in the national economy; as a mail clerk, DOT #209.687-026, with an SVP of two and a light exertional level and 29,900 jobs in the national economy; and as a routing clerk, DOT #222.687-022, with an SVP of two and light exertional level and 123,600 jobs in the national economy. (*Id.*).

Duncan's counsel inquired of the VE if her answer would be affected if the individual was going to have to elevate their legs for 30 minutes at least every two hours, and the VE indicated that this limitation would eliminate all positions. (*Id.*). If, with the first hypothetical, the individual was also limited to occasional superficial interactions with others, that would eliminate the storage facility rental clerk position, but would not affect the individual's ability to work as routing clerk or mail clerk. (Tr. 64). If the individual would also be absent at least two times per month, that would exceed tolerances in competitive employment. (*Id.*). Upon inquiry from the ALJ, the VE stated that her testimony had been consistent with the DOT, except that the

9

DOT does not address the need to elevate the legs or absences, and that the testimony on those subjects was based upon her experience. (*Id.*).

## IV. The ALJ's Decision

In her decision dated April 16, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2026.

2. The claimant has engaged in substantial gainful activity from December 31, 2022, the alleged onset date. (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lymphedema; degenerative disc disease of the lumbar spine; and chronic hepatitis C (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except stand and/or walk for 2 hours total in an 8-hour workday; occasionally push and/or pull with the bilateral lower extremities; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; frequently balance; occasionally stoop, kneel, crouch and crawl; and avoid all hazards defined as work in unprotected heights and no commercial driving.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 18, 1982, and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the

           claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-40).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

11

bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.     Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error

12

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Duncan brings one issue for this Court's review: Whether the ALJ's finding at Step Five that Duncan is capable of performing a significant number of jobs is unsupported by substantial evidence when the ALJ's residual functional capacity finding does not include Duncan's documented need to elevate her legs throughout the workday. (ECF Doc. 8, p. 1). Duncan argues that her testimony describing her issues with lower extremity swelling and the need for elevation is supported by the opinion of her treating physician, Dr. Kauffman, rendered on March 26, 2024. (*Id.*, at 10). Dr. Kauffman opined that Duncan would need to elevate her legs for 30 minutes every one to two hours throughout the workday. (Tr. 576). The ALJ found this portion of Dr. Kauffman's opinion "not entirely consistent with the rest of the record." (Tr. 35). Duncan contends that this opinion is buttressed by an examination conducted on December 26, 2022, where edema was found in Duncan's bilateral lower extremities, and this condition was described as "at baseline," supporting the contention that it is a chronic condition. (Tr. 313). Duncan also argues that the ALJ's reliance on the state agency medical consultants was

13

misguided, as both consultants found that Duncan suffers from chronic swelling of her lower extremities, rendering Dr. Kauffman's opinion regarding the need for leg elevation a "reasonable restriction." (ECF Doc. 8, p. 10).

The Commissioner counters that the ALJ considered Duncan's alleged need to frequently elevate her legs but found that restricting her to two hours standing/walking during the workday, along with other postural limitations and avoidance of hazards, adequately accounted for her issues with leg swelling and pain. (ECF Doc. 10, p. 5). The Commissioner notes that the ALJ observed that there were only three documented periods of lower extremity edema, and that Duncan was otherwise found to have normal gait, sensation, and range of motion. (Tr. 30-31; see Tr. 305, 312-13, 320, 460, 510, 521, 565). The ALJ also took into account the opinions of the two state agency physicians who, with the benefit of reviewing the entirety of the record, did not indicate a need for Duncan to elevate her legs during the workday. (Tr. 71-72, 88-90). The Commissioner contends that Duncan is merely asking this Court to reweigh the evidence, and reconsider the ALJ's assessment of Dr. Kauffman's opinion, although the ALJ assessed the opinion's consistency and supportability as required by the regulations. (ECF Doc. 10, p. 7)

During the sequential evaluation process, an ALJ must identify the claimant's RFC, which "is the most [the claimant] can still do despite [her] limitations." 20 C.F.R. 404.1545(a)(1). The RFC denotes "functional limitation and restrictions and . . . [the claimant's] remaining capacities for work-related activities." SSR 96-08p, 1996 WL 374184, at *1. The ALJ assesses "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *1. The ALJ must "consider [the claimant's] ability to meet the physical, mental, sensory, and other

14

requirements of work." 20 C.F.R. 404154(b)(4); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F.App'x 574, 577 (6th Cir. 2009).

"A RFC determination is a legal finding, not a medical determination; thus an 'ALJ – not a physician – ultimately determines a claimant's RFC.'" *Peirce v. Saul*, No. 3:20-CV-0248, 2021 WL 606369, at *6 (N.D. Ohio Jan. 25, 2021), *report and recommendation adopted sub nom. Peirce v. Comm'r of Soc. Sec.*, No. 3:20-CV-00248, 2021 WL 602979 (N.D. Ohio Feb. 16, 2021), quoting *Coldiron v. Comm'r of Soc. Sec.* 391 F.App'x 435, 439 (6th Cir. 2010) ; *see also Nejat,* 359 F.App'x at 578. ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. 404-1546(c)("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity."). "[E]ven where an ALJ provides great weight to an opinion, an ALJ is not necessarily required to adopt wholesale limitations contained therein." *Harris v. Comm'r of Soc. Sec.*, No. 1:13-cv-00260, 2014 WL 346287, *11 (N.D. Ohio Jan. 30, 2014) ("[T]he regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence' of record."). "'Although the ALJ may not substitute his opinion for that of a physician' in fashioning an RFC, the ALJ 'is not required to recite the medical opinion of a physician verbatim in his [RFC] finding.'" *Peirce*, 2021 WL 606369, at *19; quoting *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009).

An ALJ is not obligated to give "good reasons" for not adopting a consultant's opinion as written. 20 C.F.R. § 404.1527(c)(2) (stating that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). Instead, the ALJ's only articulation duty is to "explain how [they]

15

considered" the "most important factors . . . of supportability . . . and consistency." 20 C.F.R. § 404.1520c(b)(2). Accordingly, it is incumbent on the ALJ to build a logical bridge, supported by substantial evidence, between the record and the final RFC, allowing a subsequent reviewer to follow the ALJ's reasoning. *Peirce*, 2021 WL 606369, at *20; *see also generally Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541-544-46 (6th Cir. 2004).

The ALJ must "articulate [his] consideration of medical opinions" and "how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. § 404.1520c, *see also Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916 at 5 (N.D. Ohio, Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c.

Here, the ALJ cited ample evidence in support of her final residual functional capacity. She noted that Duncan's allegations of limitation in standing, walking, exertion, using her hands, and the need for leg elevation are not entirely consistent with the record. (Tr. 30). The ALJ wrote that exam findings from August 31, 2022, just prior to the alleged amended onset date, showed no swelling and normal range of motion. (*Id.*). Examination notes from December 26, 2022, noted edema in the bilateral lower extremities (baseline by report), but also showed normal range of motion throughout, intact sensation and a stable and coordinated gait. (Tr. 31). On January 4, 2023, findings included "massive lower extremity edema, with scars on legs, but otherwise unremarkable throughout." *(Id.)*. On June 9, 2023, exam findings included a normal gait, no

16

sensory defects, and imaging was negative for deep vein thrombosis. (*Id.*). She was admitted to the hospital from July 10 to July 12, 2023, due to a left leg infection. Her findings then included swelling in the left lower extremity, but no swelling otherwise. (*Id.*). Finally, notes from a consultative examination on October 25, 2023, included findings of ambulating without difficulty. (*Id.*).

> Based on the above, the ALJ wrote the following:
>
> The claimant's reports and exam findings demonstrate intermitting issues with leg edema; however, the claimant's exam findings generally demonstrated intact sensation, gait, strength, range of motion, reflexes and coordination. This evidence is not entirely consistent with significant, disabling limitations in standing, walking, sitting, postural activities, as reported by the claimant. The record does not consistently reflect edema that would necessitate the degree and frequency of leg elevation throughout the normal workday as alleged. This does not suggest that the claimant is incapable of sustaining physical activity consistent with the above residual functional capacity finding.

(*Id.*). The ALJ has succinctly and thoughtfully built a logical bridge, supported by substantial evidence, from the medical record to her RFC in a manner that that allows a reader to easily follow her reasoning.

Further, the ALJ has adequately explained why she found the opinions of Dr. Kauffman unpersuasive. The decision avers that the opinions are not consistent with Dr. Kauffman's own exam findings, noting that on December 26, 2022, the findings included normal breathing; normal range of motion throughout; edema in bilateral lower extremities (baseline by report); fluent speech; 5/5 strength in upper extremities; intact sensation; a stable and coordinated gait; and normal behavior and thought content. (Tr. 34, 312-13) Findings from Duncan's visit with Dr. Kauffman on January 4, 2023, noted "massive lower extremity edema, with scars on legs" but otherwise unremarkable findings throughout including normal breathing sound and effort, skin, and behavior. (Tr. 34-35, 460). The ALJ's decision notes that while these findings "might

17

support prescribed leg elevation, this portion is not entirely consistent with the rest of the record." (Tr. 35).

The ALJ notes that in other examinations, as noted above, the exam findings included edema in the lower extremities on one visit aside from those with Dr. Kauffman, no findings of edema in the upper extremities, an unremarkable gait, normal sensation, normal range of motion throughout and normal breathing effort and sounds. (*Id.*). The ALJ wrote, "[t]hese findings do not suggest the claimant has greater limitations than the abilities set forth in the above residual functional capacity findings. They are not consistent with great limitations with standing, walking, exertion, using her hands, time off-task, absenteeism and the need for leg elevation as opined by Dr. Kauffman." (*Id.*). The ALJ further contrasted the opinions of Dr. Kauffman with those of the state agency medical consultants, finding the less restrictive opinions of the state agency physicians to be supported by the evidence, noting in contrast that Dr. Kauffman's opinion is "neither supported nor consistent with the other evidence. Accordingly, it is not persuasive." (*Id.*). This thorough assessment of the supportability and consistency of Dr. Kauffman's opinions well surpassed the ALJ's onus in evaluating Dr. Kauffman's opinions.

As the ALJ has clearly met the burden of building a logical bridge from the evidence in the record to the RFC and has adequately discussed the supportability and consistency of the expert opinions, I cannot recommend that this Court accept Duncan's invitation to reweigh the evidence. It is therefore my recommendation that the decision of the ALJ be affirmed.

**VII.      Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Duncan's applications for DIB and SSI be affirmed.

Dated: January 6, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

***

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary

19

to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)